**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| **PETER PANTAZES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.  04-1056 (ESH)** |
| ) | |
| **ALPHONSO R. JACKSON,** ) | |
| **Acting Secretary,** ) | |
| **Department of Housing** ) | |
| **and Urban Development,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

---

## MEMORANDUM OPINION

Plaintiff Peter Pantazes has brought suit against the Secretary of the Department of

Housing and Urban Development ("HUD") under the Rehabilitation Act, 29 U.S.C. §§ 791, 794d

("the Act"), for failing to provide him with reasonable accommodations and accessible

technology, and for harassing him because of his disability.  Plaintiff claims that after returning

to work following a stroke that left his vision impaired and diminished his short term memory,

HUD took years to provide him with the accommodations recommended by both his doctors and

the agency's own consultants, failed to work in good faith with him in identifying appropriate

accommodations, and created a hostile work environment where HUD managers disparaged and

disregarded plaintiff's accommodation requests.  Defendant now moves for summary judgment

and dismissal of plaintiff's claims on the basis that Pantazes is not disabled within the meaning

of the Act, any failure to accommodate his needs is attributable to his own refusal to cooperate

with the agency, and the agency took all reasonable steps to accommodate plaintiff's needs and

therefore did not create a hostile work environment.  However, there are genuine issues of

material fact, and thus, defendant's motions must be denied.


## BACKGROUND

Plaintiff Peter Pantazes has been employed at HUD since 1991, where he has performed

various types of financial analyses.  (Pl.'s Ex. 3 (Pantazes Decl.) at 1-2.)  In December 1999,

plaintiff was promoted to GS-14 and assigned new duties as a Loan Finance Specialist at HUD's

Office of Community Planning and Development ("CPD").  (*Id.*; Def.'s Revised Ex. 2

(Notification of Personnel Action dated Dec. 5, 1999).)  About a week later, plaintiff suffered

congestive heart failure and a stroke, which damaged his optic nerve, leaving him permanently

unable to see in the left visual field, generally diminished his visual acuity, and resulted in short

term memory loss and easy distractability.  (Pl.'s Ex. 1 (Mar. 15, 2000 letter from Dr. Whicker of

Neurological Medicine, P.A.); Pl.'s Ex. 3 at 1-2.)  Plaintiff also suffered from depression as a

result of his poor physical condition.  (Pl.'s Ex. 2 (Mar. 28, 2000 letter from psychiatrist Dr.

Ganjoo).)  In order to "decrease his depression and increase his self-esteem," plaintiff was to

return to his routine, including to work at HUD.  (*Id.*)  Plaintiff's psychiatrist noted that for

Pantazes "to do his work he needs appropriate equipment for the needs of his disability."  (*Id.*)

His neurologist stated that plaintiff "needs visual accommodations including but not limited to a

21 inch computer monitor, a small TV screen [in addition to the monitor, for magnifying paper

documents], large print books and magnifying aids."  (Def.'s Ex. 4 (prescription of April 3, 2000

by Dr. Whicker).)  Plaintiff's occupational therapist and speech-language pathologist stated that

"to optimize his work performance, we have recommended that Mr. Pantazes try to increase the

size of small print on computer screens and frequently used text, utilize organizational and memory aids, and keep distractions in his immediate work environment to a minimum." (Def.'s Ex. 4 (letter from Brown and Cozens-Hoffman at Laurel Regional Hospital).) Plaintiff's mobility was also hindered as a consequence of his congestive heart failure, morbid obesity, and Pickwickian Syndrome. (Def.'s Ex. 4 (Jan. 20, 2000 letter from Dr. Romero).)

In March 2000 plaintiff returned to work and submitted to his supervisor, Paul Webster, the above-referenced medical documentation (Pl.'s Ex. 3 at 2), as well as a letter signed by plaintiff requesting various accommodations, including office supplies, training in the work of the department to which he had been promoted just before his stroke, re-training in various computer programs as a result of his stroke, large print reference materials, a "computer monitor screen shade to stop glare," and a "large adjustable desk magnifier with fluorescent lamp." (Pl.'s Ex. 5.) He further stated that, "to assist in preventing eye fatigue and migraine, [he] would appreciate a small couch or large soft chair with flourescent floor lamp behind it for reading so I may continue my work; to be able to change positions keeps me alert." (*Id.*) He noted that "I will pay for a small refrigerator & microwave, unless HUD can supply one. Need this for special dietetic, salt free and fat free foods, I will pay for it, if need be. Can no longer eat commercially prepared foods in cafeteria." (*Id.*)

About a week after HUD received the accommodation request and supporting medical documentation, Linda Grant, Director of CPD's Management Division, called a meeting with Hugh Allen, plaintiff's team leader (Def.'s Ex. 6 (Allen Aff.) at 7) and several other HUD officials to discuss plaintiff's requests. (Def.'s Ex. 7 (Grant Aff.) at 4-5.) The HUD officials decided that Allen would order the requested ordinary office supplies, and according to Grant,

Allen told plaintiff that further medical documentation was required for several of Pantazes' other requested accommodations, although Grant was "not sure exactly when [Allen] did this I would believe it was shortly after our meeting."  (Def.'s Ex. 7 (Grant Aff.) at 5.)  However, Allen states unequivocally that "I never talked to the Complainant about medical documentation," and asserts that "it would have been someone in Linda Grant's division that would have made the Complainant aware that he needed to provide more medical documentation.  This information may have been conveyed to the Complainant in August 2000 or shortly thereafter."  (Def.'s Ex. 6 (Allen Aff.) at 8.)  Regardless of this conflicting testimony, the record shows that Allen did not even order basic office supplies for plaintiff, such as a magnifying glass, writing implements, and paper, until late May (Def.'s Ex. 5 (purchase order)), although Allen claims this two-month delay was required in order to determine what supplies were already available within the division and that plaintiff had received some supplies in the interim.  (Def.'s Ex. 6 at 5-6.)

Plaintiff contends that, other than a few contacts with Allen about basic supplies, he heard nothing about his accommodation requests for the four months after returning to work.  In August 2000, however, Pantazes was directed to resubmit his accommodation request on HUD Form 1000.  (Pl.'s Ex. 3 at 4.)  Allen confirmed that he only spoke with plaintiff about office supplies, and Allen could not recall ever mentioning Form 1000 or the need for further paperwork to Pantazes.  Allen nonetheless acknowledged that it would be "my responsibility to make management and the administrative support or staff aware of any requests and then ask for assistance in addressing and assessing the [accommodation] requests."  (Def.'s Ex. 6 at 6-8, 11.)  Grant's testimony contradicts Allen's statement, since she claims that she mentioned to Allen "the need for a formal request so that we could get information from [plaintiff's] doctor to

explain why he needed the items requested," and asserts that "I recall Mr. Allen having conversations over time with the Complainant regarding this information and we never received it." (Def.'s Ex. 7 (Grant Aff.) at 5-6.) She maintains it was Allen's responsibility to inform plaintiff of the need for a HUD 1000 form. (*Id.* at 6 ("Mr. Allen would have been the person to communicate this information about the need to have the Complainant submit a formal request to provide more detailed medical information.").) She claims that plaintiff is incorrect in contending that he was never told to submit a Form 1000 until August, asserting that "I remember mentioning this to Mr. Allen as well as the Complainant directly." (*Id.*) But she has no idea when she did that. (*Id.*) The balance of her statement indicates, however, that she interacted primarily with Allen and not directly with Pantazes. (*Id.* at 6-7.) Within days of when he claims he was told to submit a Form 1000, Pantazes promptly did so, and thereafter, Allen, as plaintiff's team leader, signed the form on August 10, 2000. (*See* Pl.'s Ex. 7 (Form 1000).)

However, HUD staff promptly lost the Form 1000 and the accompanying 26 pages of attachments which Pantazes had already submitted on three prior occasions during the preceding five months. (Pl.'s Ex. 3 at 4; Ex. 7.) At this point, Pantazes submitted his documentation for the fourth time. (Pl.'s Ex. 3 at 4.) After another delay of several months, Pantazes was informed on December 5, 2000, by Linda Johnson, Chief of the Human Resources Division, that his HUD 1000 form could not be processed until he signed a medical release. Apparently in the interim, Johnson had been communicating with Pantazes' supervisor about getting such a release signed, but no action had been taken. (Def.'s Ex. 7 (Grant Aff.) at 8.) Pantazes had been told nothing of the need for such a release. (Pl.'s Ex. 3 at 5.) Once Johnson contacted Pantazes directly, plaintiff tried to get the required form as directed by Johnson, but the designated HR contact

person never returned his messages and was not in the office at the time Johnson had designated for Pantazes to pick up the form.  (*Id.*)  Finally, Pantazes bypassed the contact person, found someone else in HR to get him the form, and he signed it immediately.  (*Id.*)

In September 2000 HUD claims it outfitted plaintiff's computer with and provided him training on MAGic, "HUD's standard software provided to low-vision users for screen magnification capability."  (Def.'s Ex. 8 (Weathers (Acting Director, Customer Service Division, Office of Technology Operations) Decl.) at 2.)  Plaintiff, however, "has no memory of this whatsoever and I believe I would recall it if it had been done."  (Pl.'s Ex. 3 (Pantazes Decl.) at 3.)  Plaintiff does not dispute, however, that in that month HUD installed a large screen monitor at his workstation.  (Def.'s Ex. 8 at 2; Pl.'s Ex. 3 at 3.)  In any event, neither party maintains that the MAGic software was on plaintiff's computer during the following two years.  (Def.'s Ex. 8 at 2-3 (contending MAGic was removed at plaintiff's direction); Pl.'s Ex. 3 at 6-7.)

In October 2000 Pantazes submitted further medical documentation to his supervisors. Opthamological specialists at Johns Hopkins Hospital had evaluated plaintiff in order "to provide assistance and recommendations to Mr. Pantazes to maintain his employment."  In their letter, the doctors suggested solutions to "greatly enhance [plaintiff's] work" by addressing "difficulties with restricted field vision in the performance of everyday tasks specifically reading his computer screen and overhead projector presentations at work."  They recommended the software Zoomtext Level 2 (at a cost of $595), which enlarges computer text, reverses its color to white on black, and provides speech output.  They further recommended a program to provide variable speed speech output of text, as well as bioptic glasses.  (Pl.'s Ex. 13 (Oct. 12, 2000 letter from

Wilmer Opthalmological Institute); *see also* Pl.'s Ex. 12 (June 13, 2002 letter from Hopkins' Dr. Park (explaining doctors' recommended accommodations).)

Eleven months after plaintiff submitted his accommodation request, a HUD representative, Deborah Rizzo, contacted plaintiff to discuss his situation and needs in February 2001.  (*Id.*)  She arranged for plaintiff to be evaluated by Kathy Eng, an ergonomics vision specialist at the USDA Target Center.  (Def.'s Ex. 10 (Rizzo Decl.) at ¶ 7.)  After overcoming several scheduling difficulties, Eng performed a needs assessment for reasonable accommodations with Mr. Pantazes on March 7, 2001.  The Target Center's recommendations were guided by the principle that they should be "cost effective with the employee's health and safety as the highest priority."  The Center subsequently informed Rizzo that it "supports the accommodation recommendations made by [plaintiff's] medical team."  (Pl.'s Ex. 11 (USDA's April 18, 2001 letter).)   Similarly, HUD's consultant, Federal Occupational Health physician Dr. Neal Presant, evaluated plaintiff's requested accommodations and spoke with his various physicians.  He supported the Target Center's decision to defer to the recommendations of plaintiff's opthamological specialists concerning plaintiff's need for Zoomtext magnification software, a 21 inch computer monitor, a Closed Circuit Televiewer ("CCTV") to display magnified images of hard-copy, paper documents, large print books, and other similar accommodations.  (Pl.'s Ex. 14 (May 2, 2001 letter from Dr. Presant to Rizzo).)

The record reveals no further actions by defendant during the subsequent five months regarding the identification or provision of the proper accommodations for plaintiff's disability. Then in October 2001, Grant scheduled yet another evaluation of plaintiff, this time by the Columbia Lighthouse for the Blind.  (Def.'s Ex. 1 (Grant Decl.) at 3-4.)  However, the

appointment was made for a Friday, which is plaintiff's day off.  (Pl.'s Ex. 3 at 6.)  Grant claims

she requested that plaintiff suggest a convenient time for another appointment (Def.'s Ex. 1 at 4),

but plaintiff denies that such a request was ever made.  (Pl.'s Ex. 3 at 6.)  In any event, no such

evaluation took place.  (*Id.*)

Six months later, in April 2002, various HUD officials once again began discussing how

to accommodate plaintiff's needs.  (Def.'s Ex. 10 at ¶¶ 16-18.)  During the following three

months, the agency explored what type of software to install to address plaintiff's low vision

impairment.  (*Id.*)  HUD maintains that it could not install the Zoomtext software recommended

by plaintiffs' physicians, because it was incompatible with the agency's computer system at the

time.  (Def.'s Ex. 8 at 3.)  When Pantazes installed a trial version of the Zoomtext software

himself on his work machine and was able to use it without incident, the agency promptly

removed it.  (Pl.'s Ex. 3 at 7.)  In November 2002, over Pantazes' objection, MAGic was

reinstalled on his machine after HUD determined, based on a letter from Columbia Lighthouse

for the Blind comparing MAGic and Zoomtext, that the programs were "the two leading screen

magnification software packages used by federal agencies," and that MAGic was "the

appropriate software to install on Mr. Pantazes' workstation to accommodate his low vision

impairment."  (Def.'s Ex. 10 at ¶¶ 18-19.)[1]  Pantazes, however, claims that MAGic is not an

effective accommodation for his visual impairment, because it magnifies text *too much*, meaning

that it often overflows the screen and thereby slows his performance, whereas Zoomtext has

---

[1] The Columbia Lighthouse letter is not in the record and has never been produced to
plaintiff.  (Pl.'s Ex. 3 at 6.)

smaller magnification gradations, which allow plaintiff to read the text while still seeing an entire page on his monitor.  (*Id.* at 7-8; Pl.'s Exs. 18-19.)

At the same time, two and a half years after receiving medical documentation supporting plaintiff's request for a CCTV, HUD installed such a system at plaintiff's workspace.  (Def.'s Ex. 8 at 4.)  However, the CCTV is hooked up to the same monitor as plaintiff's computer, meaning that Pantazes cannot simultaneously use the CCTV to look at a paper document while also having access to his computer's programs, which significantly diminishes the utility of the CCTV system and slows Pantazes' work pace.  (Pl.'s Ex. 3 at 8.)  In effect, plaintiff must use the CCTV system to magnify a page, then remember a few words while he switches to a computer program, then type the words, then switch back to the CCTV magnification and begin the entire process again.  (Pl.'s Resp. to Def.'s Stmt. of Material Facts at ¶ 17.)

For the period from October 22, 2002 to April 3, 2003, when plaintiff purportedly had "full accommodations" (Def.'s Ex. 1 (Grant Decl.) at 5), notwithstanding defendant's admission that the CCTV, for instance, was not installed until November 22, 2002 (Def.'s Ex. 8 at 4), plaintiff was rated unacceptable at the job tasks of processing and reviewing loan guarantee applications and administering and monitoring guaranteed loans.  (Def.'s Ex. 12 (Progress Review Record signed by Rating Official Webster).)  Plaintiff acknowledged receipt of this document by writing in his signature space that he "did not receive proper training due to handicaps" and that he lacked the proper equipment.  (*Id.*)  As a result of this rating, he was placed on an "Opportunity to Improve Plan" on August 5, 2003, but the agency has not yet taken any disciplinary action against him.  (Def.'s Ex. 1 at 5.)

Pantazes also asserts that in December 2000 he asked Laura Marin, Director of Technical Assistance and Management in the division where he works, why it was taking so long to provide the accommodations requested by his physicians, and she allegedly responded, "I don't care if it takes nine months or nine years.  We will determine what is a reasonable accommodation not letters from your doctors.  If you don't like it you can quit.  You've been a trouble maker for some time now."  (Def.'s Ex. 7 at 11; Pl.'s Ex. 3 at 8.)  In addition, Hugh Allen, plaintiff's team leader, purportedly told plaintiff "you're not disabled," "you're faking," and "there is nothing wrong with you."  (Compl. ¶ 6; Pl.'s Ex. 15.)

# ANALYSIS

## I.      Standard of Review

Under Fed. R. Civ. P. 56, a motion for summary judgment shall not be granted unless the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[A]n added measure of 'rigor,' or 'cautio[n],' is appropriate in applying this standard to motions for summary judgment in employment discrimination cases.  Courts reviewing such motions must bear in mind that a factfinder could infer intentional discrimination even in the absence of crystal-clear documentary evidence filed at the summary judgment stage."  *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997) (en banc) (citations omitted).

In considering a motion for summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at

255; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d

320, 325 (D.C. Cir. 1989).  "Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Liberty*

*Lobby*, 477 U.S. at 255.  The non-moving party's opposition, however, must consist of more than

mere unsupported allegations or denials and must be supported by affidavits or other competent

evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P.

56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## II.    The Rehabilitation Act

Plaintiff's claims arise under the Rehabilitation Act, which provides, *inter alia*, that "no

otherwise qualified individual with a disability" may be discriminated against by a federal agency

"solely by reason of her or his disability."  29 U.S.C. § 794(a).  The Act also provides that the

standards governing employment discrimination claims applicable under the Americans with

Disabilities Act ("ADA") apply to the Rehabilitation Act, *id.* § 794(d), and thus, the legal

principles are the same.  *See Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 n.10 (D.D.C. 2002).

Under the ADA, discrimination includes "not making reasonable accommodations to the

known physical or mental limitations of an otherwise qualified individual with a disability who is

an applicant or employee, unless such covered entity can demonstrate that the accommodation

would impose an undue hardship on the operation of the business of such covered entity." 42

U.S.C. § 12112(b)(5)(A); *see also* 29 C.F.R. § 1614.203(c)(1) (EEOC Rehabilitation Act

regulation).  A qualified individual with a disability is "an individual with a disability who, with

or without reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires." *Id.* § 12111(8); *see also* 29 C.F.R. § 1614.203(a)(6).

To make out a claim under the Act, plaintiff must present direct evidence of discrimination based on his disability, or he may provide indirect evidence of discrimination. For certain Rehabilitation Act claims, the three-step burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  *Duncan v. WMATA*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc).  But as the D.C. Circuit has noted, that "test is not equally applicable to all cases" alleging disability discrimination.  *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993).  In particular, in a reasonable accommodation case, plaintiff "carries the burden of proving by a preponderance of the evidence that [he] has a disability, but with a reasonable accommodation (which [he] must describe), [he] can perform the essential functions of [his] job." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).  This approach governs cases "(1) where the employer claims non-discriminatory reasons for its adverse employment action; [and] (2) where the employer maintains that the employee is not an otherwise qualified individual with a disability, or that no reasonable accommodation is available, so that the plaintiff falls outside the scope of ADA protection."  *Id.* (citing *Barth*, 2 F.3d at 1186). Therefore, it applies here to plaintiff's claims relating to HUD's alleged failure to provide him with reasonable accommodations and access to information technology comparable to that available to other federal employees.

III.    **Plaintiff's Reasonable Accommodation and Comparable Technology Claims**

To make out a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate, *see* 29 U.S.C. § 794(a), and for failure to ensure that  "individuals with

disabilities who are Federal employees . . . have access to and use of information and data that is comparable to the access to and use of the information and data by Federal employees who are not individuals with disabilities," *id.* § 794d(a)(1)(A)(i), a plaintiff must show "(1) that he was an individual with a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Scarborough*, 190 F. Supp. 2d at 19 (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001)).

Defendant argues that it should prevail because plaintiff was not a qualified disabled individual for purposes of the Act; plaintiff could not perform his job even with accommodations; and in any event, HUD has now offered plaintiff suitable accommodations. Defendant does not contest that it had notice of plaintiff's disability in March 2000, when he submitted a packet of documents to support his requested accommodations. (Def.'s Mot. at 17.)[2]

Defendant first argues that Pantazes cannot satisfy the first prong becuse he is not a qualified disabled individual on the grounds that he cannot perform the essential functions of his

---

[2] With respect to plaintiff's reasonable accommodation and comparable technology claims, defendant waited until its reply brief to argue that plaintiff has suffered no adverse action, which would, in defendant's view, preclude plaintiff's claims. (*See* Def.'s Reply at 10; *compare* Def.'s Mot. at 26-27 (raising adverse action argument only with regard to plaintiff's hostile work environment claim).) Plaintiff has had no opportunity to respond to this argument, and the Court therefore may not grant summary judgment on this basis. *See Keyes v. District of Columbia*, 372 F.3d 434, 438 (D.C. Cir. 2004) (declining to consider issue raised for the first time in a reply brief). Moreover, the case defendant cites concerning the "harm" a plaintiff must suffer in order to advance a failure to accommodate claim does not apply the adverse action standard used in the Title VII context, *see Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 737 n.6 (5th Cir. 1999), and withholding accommodations can itself constitute actionable discrimination for purposes of the Act. *See* 42 U.S.C. § 12112(b)(5)(A); *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999) ("Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities.").

job with or without an accommodation, "particularly in view of his rejection of ample and reasonable accommodations provided by the agency."[3/]  (Def.'s Mot. at 15.)  In order to show that he is "otherwise qualified" for the position, "a plaintiff must, in order to make out a prima facie case, show that she or he can perform the essential functions of the job in spite of the handicap either (a) with no need for accommodation, or (b) with a reasonable accommodation. We do not view the plaintiff's burden with respect to the latter alternative as a heavy one.  We would deem it sufficient on this issue for the plaintiff to present evidence as to her or his individual capabilities and suggestions for some reasonable assistance or job modification by the employer."  *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991).

Here, plaintiff has presented evidence that he can perform his job with accommodations such as Zoomtext, a separate CCTV system for magnification, and proper lighting.  His doctors, as well as the agency's specialists, have said as much.  Rather, HUD's argument hinges on the notion that plaintiff is not "qualified" because he purportedly rejected various accommodations that had been offered.  *See* 29 C.F.R. § 1630.9(d) (where a disabled "individual rejects a reasonable accommodation . . . that is necessary to perform the essential functions of the position held . . . and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability").

Defendant's argument fails for several reasons.  First, it is at odds with defendant's admission that "with the accommodations provided to Complainant, he is able to perform the

---

[3/] Neither party disputes that plaintiff is disabled as that term is used in the Rehabilitation Act.  *See* 29 U.S.C. §§ 706(8)(B), 706(9)(B) (defining disability as "a physical or mental impairment that substantially limits one or more of the major life activities"); *see also Lester v. Natsios*, 290 F. Supp. 2d 11, 25 (D.D.C. 2003).

essential functions of his position during his normal tour of duty."  (Def.'s Ex. 11 (Def.'s

Responses to Requests for Admission, dated March 1, 2002) at 3.)  *See Langon v. Dep't of*

*Health & Hum. Servs.*, 959 F.2d 1053, 1058 (D.C. Cir. 1992) (decrying agency's "whipsaw[ing]"

of disabled Rehabilitation Act plaintiff via defendant's "incongru[ous]" and shifting contentions

about her ability to work).

Moreover, even if the Court were to consider defendant's contradictory argument, there

are material questions of fact that preclude summary judgment.  For instance, the parties dispute

whether accommodations that Pantazes purportedly rejected, thereby rendering him unqualified

in defendant's view, were in fact provided to him.  HUD maintains that MAGic was installed and

removed from plaintiff's computer in September 2000 (Def.'s Mot. at 23), but plaintiff claims

that the software was never installed until November 2002.  (Pl.'s Ex. 3 at 6.)  In any event, such

software has been installed on plaintiff's machine for the past two-and-a-half years, so if this

software in fact accommodates his disability, as argued by defendant, it is difficult to see how

any previous delay in the software installation renders him "unqualified" at this late date.

Defendant further argues that plaintiff is unqualified because he was never evaluated by

Columbia Lighthouse for the Blind.  (Def.'s Mot. at 24.)   Whether Columbia's evaluation was

ever rescheduled, after initially being set on a day when plaintiff does not work, is disputed.  In

any event, plaintiff was evaluated by several other agency specialists, all of whom agreed with

plaintiff's medical specialists, so it is difficult to understand the significance of the lack of

evaluation by Columbia.

Finally, defendant argues that plaintiff is unqualified because he has not shown that he

can perform his job notwithstanding the accommodations he rejected, and to support this

argument, HUD points to plaintiff's "unacceptable" performance review for the period from

October 22, 2002 to April 3, 2003.  (Def.'s Mot. at 24.)  Putting aside defendant's concession

that plaintiff *can* do his work, as well as the evidence that any accommodations plaintiff initially

rejected had been implemented by the time of the performance review, defendant's argument

suffers from factual problems.  Defendant's own evidence shows that HUD's characterization of

this period as one when plaintiff had been offered "full accommodations" is incorrect.  (*See, e.g.*,

Def.'s Ex. 8 at 4 (CCTV was not installed until November 22, 2002); Pl.'s Ex. 3 at 9 (plaintiff to

date has still not received training in light of his disability, even though such training would only

require three or four days); Def.'s Ex. 11 at 5 (defendant admits it has not approved such

training).)  It is thus disputed whether plaintiff was afforded reasonable accommodations so as to

enable him to perform his essential job duties during the review period.  *See Bultemeyer v. Fort*

*Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("[Plaintiff] may have been qualified,

because he may have been able to perform the essential functions of the job *with reasonable*

accommodation.") (emphasis in original).

      With respect to the third prong, plaintiff has at least raised an issue of fact as to whether

he could perform the essential functions of the position with reasonable accommodation given

HUD's March 2002 admission that plaintiff can "perform the essential functions of his position

during his normal tour of duty" (Def.'s Ex. 11 at 3), as well as plaintiff's evidence that he can

indeed do his work if given the accommodations recommended by numerous specialists.  For

instance, Johns Hopkins' Dr. Park recommended several accommodations (*i.e.*, certain

magnifiers and software) that would enable plaintiff to "perform his occupational role."  (Pl.'s

Ex. 12; *see also* Pl.'s Ex. 13.)  Plaintiff further notes that he was an excellent performer at HUD

prior to his stroke, and that if granted the reasonable accommodations and training requested, he can do his job.  (Pl.'s Ex. 3 at 9.)

Finally, defendant contends that HUD has in fact made reasonable accommodations for plaintiff, as required by the fourth prong of the applicable test.  Defendant is correct that, simply because an accommodation preferred by an employee is available, an employer need not offer that particular accommodation so long as a reasonable alternative is provided.  *See Hankins v. Gap, Inc.*, 84 F.3d 797, 800-01 (6th Cir. 1996) (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68-69 (1986)).  Moreover, as explained in the appendix to the ADA regulations, "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide."  29 C.F.R. pt. 1630, app. at 377 (2004).

The difficulty with defendant's position is that, in light of factual disputes, it cannot be concluded as a matter of law that the accommodations HUD provided to plaintiff were reasonable.  For instance, it is unclear whether the two software magnification programs, Zoomtext and MAGic, are in fact equally effective.  Plaintiff's experts, as well as several specialists retained by defendant, endorsed only Zoomtext as the proper accommodation.  Also, the fact that MAGic is "HUD's standard software provided to low-vision users for screen magnification capability" (Def.'s Ex. 8 at 2; Def.'s Mot. at 18) is not dispositive.  "It is plain enough what 'accommodation' means.  The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work."  *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995).  *See also U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002) ("By definition, any

17

special 'accommodation' requires the employer to treat an employee with a disability differently, *i.e.*, preferentially.").[4/]  And, as plaintiff has explained, he cannot see an entire screen of text using MAGic, which significantly impedes his ability to perform essential work tasks, because (unlike Zoomtext) MAGic only increases text in 100% increments.  (Pl.'s Ex. 3 at 7-8.)  Given this evidence, a jury could conclude that the provision of MAGic did not satisfy defendant's duty to provide a reasonable accommodation.[5/]

Furthermore, it is disputed whether the agency engaged in good faith in the "interactive process" for identifying reasonable accommodations.  Once aware of its responsibility to provide a reasonable accommodation, "the employer must make a reasonable effort to determine the appropriate accommodation.  The appropriate accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability."  29 C.F.R. § 1630.2(o)(3).  "Because the interactive process is not an end in itself, it is not sufficient for [the employee] to show that the [employer] failed to engage in an interactive process or that it caused the interactive process to break down.  Rather, [the employee] must show that the result of the inadequate interactive process was the failure of the [employer] to

--------

[4/] The same reasoning repudiates defendant's contention that it did not approve rehabilitation computer training for plaintiff because "HUD supervisors are authorized to grant only up to 1 hour of administrative leave." (Def.'s Ex. 11 at 5.)  The Act affirmatively requires defendant to modify ordinary rules where necessary, and where an employer fails to grant a reasonable accommodation request, it is the defendant's burden to justify its decision by showing that the accommodation presented an undue hardship.  *Barth*, 2 F.3d at 1187.

[5/] Defendant's contention that MAGic was chosen in lieu of Zoomtext in part because the latter was incompatible with defendant's email program and operating system (Def.'s Mot. at 19) is also disputed.  Plaintiff used a trial version of Zoomtext on his work computer without incident in 2002, and in any event, according to plaintiff, since HUD's upgrade of its computer systems over a year ago, there is no longer any compatibility problem.  (Pl.'s Ex. 3 at 7.)

fulfill its role in 'determining what specific actions must be taken by an employer' in order to provide the qualified individual a reasonable accommodation." *Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1995)).  The interactive process begins when an employee requests an accommodation.  Once this process has begun, both the employer and the employee have a duty to act in good faith, *Coneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 333 (3d Cir. 2003), and the absence of good faith, including unreasonable delays caused by an employer, can serve as evidence of an ADA violation.  *See, e.g.*, *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 514 (N.D.N.Y. 2004).  Thus, if a jury could conclude that HUD failed to engage in good faith in the interactive process, and that failure led to defendant not according reasonable accommodations to Pantazes in a timely manner, summary judgment cannot be granted.

Here, the interactive process began in March 2000, when defendant concedes it received a packet of information from Pantazes about his disability, including a request for accommodations.  Defendant argues that it "engaged in the interactive process with Plaintiff and acted in good faith to obtain the necessary accommodations," and that plaintiff was the cause for the delay in the interactive process.  (Def.'s Mot. at 19.)  However, reviewing the record in the light most favorable to plaintiff, the Court cannot agree with defendant's characterization.  On the contrary, a jury could view HUD as the party responsible for the nine-month delay in communicating to plaintiff about the need for paperwork, such as a medical release, as well as the additional delays that occurred later in the interactive process.  *Accord Breen v. Dep't of Transp.*, 282 F.3d 839, 844 n.7 (D.C. Cir. 2002) (holding that a material factual dispute concerning responsibility for a one-year delay in communicating about the need for medical

documentation about plaintiff's disability precluded summary judgment in favor of defendant agency).  *See also Bultmeyer*, 100 F.3d at 1287 (holding that employer acted in bad faith during interactive process where it relied on a technicality to justify failing to accommodate a disabled employee).

## IV.    Plaintiff's Hostile Work Environment Claim

Plaintiff's remaining claim alleges that HUD created a hostile working environment through its "unwillingness to recognize [Pantazes'] disabilities, its refusal to fully accommodate him on a timely basis, its failure to engage in the interactive process, and its actions which hindered him from the performance of his duties."  (Compl. at 10.)  He further argues that he has been abused at work, that his supervisors have not filled out paperwork in a timely manner so that he could receive medical treatment, that they have denied him training so that he could perform his job, and that as a consequence of this hostile environment, he was placed on an Opportunity to Improve Plan.  (*Id.*)

Although this Circuit has not yet ruled that the Rehabilitation Act permits a hostile work environment claim, *see Kuraner v. Mineta*, No. 00-5416, 2001 WL 936369 (D.C. Cir. July 10, 2001), defendant does not contest this issue, and indeed, it cites ADA authority where such claims have been recognized.  *See, e.g.*, *Fox v. General Motors Corp.*, 247 F.3d 169, 175-76 (4th Cir. 2001).  (Def's Mot. at 25.)  *Accord Henry v. Guest Servs., Inc.*, 902 F. Supp. 245, 252 n.9 (D.D.C. 1995).

To make out a prima facie case of a hostile work environment claim based on a disability, plaintiff must show that (1) he is a member of a protected class, in this case a "qualified individual with a disability;" (2) he was subject to unwelcome harassment; (3) the harassment occurred because of his disability; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment, but took no action to prevent it. *Lester*, 290 F. Supp. 2d at 22. The Court has already found that a jury could conclude that plaintiff is a "qualified individual," and defendant does not contest that plaintiff has satisfied each of the remaining prima facie elements, with the exception of prong four. Defendant argues only that plaintiff "has not suffered harm sufficiently severe or pervasive to alter a term, condition, or privilege of his employment." (Def.'s Mot. at 26.)

"[W]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," a hostile work environment claim may proceed. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). Defendant's arguments focus on whether placing plaintiff on an Opportunity to Improve Plan as a result of his poor performance evaluations constitutes an adverse action (Def.'s Mot. at 26), but this focus is too narrow. In assessing whether a hostile work environment existed, courts look not to "ultimate employment decisions," *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997), but rather consider the frequency of the discriminatory conduct, its severity, whether it was physically threatening or merely offensive, and whether it reasonably interfered with the employee's performance. *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998).

Applying these principles here, a jury could conclude that the agency frustrated plaintiff's efforts to secure the reasonable accommodations he was entitled to by law and that would, according to the experts, facilitate his ability to perform his job.  Moreover, plaintiff has offered evidence of alleged statements by various agency officials that suggest a discriminatory purpose, unreasonably lengthy delays by HUD in responding to his requests for accommodations, and an inadequately explained refusal to provide needed computer training.  Given this evidence, one cannot conclude at this stage that a jury could not find these acts sufficiently severe, pervasive, and abusive to alter the conditions of Pantazes' employment, thereby creating an abusive working environment.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).


## CONCLUSION

For the foregoing reasons, defendant's motions must be denied.  An appropriate Order accompanies this Memorandum Opinion.


                                            s/
_____        _____
                                 ELLEN SEGAL HUVELLE
                                 United States District Judge

Date:  March 31, 2005